RHODE ISLAND DEPOSITORS ECONOMIC PROTECTION CORPORATION

v.

P. Alan RYAN.

No. 95–285–Appeal.

Supreme Court of Rhode Island.

July 11, 1997.

Justin T. Shay, Robert Fine, Jerry H. Elmer, Providence, for Plaintiff.

George E. Babcock, Providence, Alan P. Ryan, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

The defendant in this case, P. Alan Ryan, has appealed from a summary judgment entered in the Superior Court in favor of the plaintiff, the Rhode Island Depositors Economic Protection Corporation (DEPCO). The trial justice ruled that the defendant was liable to DEPCO on a promissory note that he signed payable to Davisville Credit Union (Davisville). For the reasons that follow, we affirm the judgment of the Superior Court. The facts and travel pertinent to this case are summarized below, with additional facts supplied as needed in the legal analysis.

### Facts and Procedural History

This case had its origins in the credit union crisis. See In re Advisory Opinion to the Governor (DEPCO), 593 A.2d 943, 947 (R.I. 1991) (describing crisis). On August 5, 1988, defendant signed a promissory note in the amount of $1.6 million in favor of Davisville, where the financial transaction took place. Davisville subsequently was petitioned into receivership, and DEPCO ultimately succeeded to Davisville's rights under the note. On May 23, 1994, DEPCO, seeking to collect on the note, filed a complaint in Superior Court, alleging that defendant had defaulted on the note and that defendant was obligated under the terms of the note to pay the principal and interest plus costs and reasonable attorney's fees.

The defendant disputed his liability on the ground that he had signed the note as an agent for a disclosed principal, developer David LaRoche (LaRoche), and that Davisville knew of the relationship. The defendant conceded, however, that the note itself did not reveal any agency status, but he maintained that DEPCO was chargeable with notice of the agency relationship on the basis of other documents in Davisville's loan file. The defendant also contended that at a minimum those documents created a genuine issue of material fact about whether defendant had signed the note as an agent, thereby precluding the disposition of the case by summary judgment.

After a hearing, the trial justice rejected defendant's claims on March 14, 1995, and granted DEPCO's motion for summary judgment. The trial justice ruled that DEPCO was entitled to the protections of the federal holder-in-due-course doctrine afforded to the Federal Deposit Insurance Corporation (FDIC). Applying this doctrine to DEPCO, the trial justice determined as a matter of law that the facts alleged by defendant were insufficient to put DEPCO on notice of any agency relationship, and that consequently DEPCO was entitled to collect on the note. The trial justice further concluded, as an alternative ground for holding defendant liable, that the bank records contained no written agreement memorializing the alleged agency relationship as required by the receivership and DEPCO statutes, and for this additional reason, DEPCO was entitled to summary judgment. The defendant appealed to this Court, pursuant to G.L.1956 § 9–24–1.

### Standard of Review

In reviewing a trial justice's grant of summary judgment, this Court is bound by the same rules and standards as those applied by the trial justice. Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1225 (R.I.1996). "Accordingly, we will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Rotelli v. Catanzaro, 686 A.2d 91, 93 (R.I.1996).

### Defendant's Claims

The defendant has sought to avoid liability on the note by advancing two arguments: first, that DEPCO was on notice that defendant had signed the note as an agent and hence cannot claim the protections of the federal holder-in-due-course doctrine; and second, that the records of Davisville clearly revealed an agency relationship and thus satisfied the requirement of G.L.1956 § 42–116–23 that such agreements be in writing. In

addressing these contentions, we shall examine defendant's allegations about what actually occurred, bearing in mind our standard of review.

The defendant candidly admitted that he participated in a scheme designed to enable LaRoche to exceed the borrowing limit established by Davisville for individual debtors. As a result of this transaction, LaRoche was convicted of obtaining money by false pretenses, a conviction sustained by this Court in *State v. LaRoche,* 683 A.2d 989 (R.I.1996). The defendant has portrayed himself as an innocent pawn in these dealings, who with no fraudulent intent relied on the representations of LaRoche and Davisville officials that he would not be held personally liable on the note.

According to defendant, LaRoche was at or near his lending limit with Davisville at the time defendant signed the note, and the transaction was designed to allow "Davisville to loan money to Ryan for LaRoche's benefit." In his affidavit accompanying his objection to DEPCO's motion for summary judgment, defendant averred that prior to the August 5, 1988 closing, LaRoche and Q.L.C.R.I., an entity owned and operated by LaRoche, entered into an agreement with defendant whereby defendant would act as their special agent in the transaction with Davisville. The defendant also claimed that "Davisville was aware that the ultimate recipients of the loan proceeds would be LaRoche and Q.L.C.R.I. and Davisville actively participated in the plan to effectuate the transaction as it took place." Furthermore, according to defendant, Davisville officials told defendant that he "was not responsible for the loan and * * * would never be responsible for the loan since [he] was not the borrower." In keeping with this understanding, Davisville never sent bills, notice of default, or a demand for payment to defendant.

The defendant identified lending-procedure irregularities in several documents in the loan file that, he claimed, revealed the true nature of the loan. The defendant alleged that at the time he signed the note, his annual income was $36,000, obviously inadequate to service a $1.6 million loan. The loan

nevertheless was approved because, as Helen I. Arkwright, a Davisville branch manager, acknowledged at the LaRoche criminal trial, Davisville was aware that LaRoche was "standing behind" Ryan on the loan. The defendant observed that he never completed a loan application, never provided Davisville with any financial information, and never signed a purchase-and-sale agreement for the property that was mortgaged as part of the transaction. This property, consisting of forty-three waterfront lots in Portsmouth, Rhode Island, was "owned" by defendant for only fifteen minutes, just long enough for defendant to sign the note and mortgage before deeding the property to Q.L.C.R.I. by quitclaim deed. The defendant also noted that the incomplete loan application in the loan file bore the notation "For statements use the following: P. Alan Ryan, P.O. Box 336, North Kingstown, R.I. 02852." This address, according to defendant, was in fact the address of LaRoche. Moreover, the loan file contained a document entitled "Davisville Loan Committee Comments," signed by members of the loan committee, which stated that the purpose of the loan was to "pay off David Brodsky loan + 200,000 to pay Dutra." Brodsky and Dutra, according to defendant, were known by the loan committee to be creditors of LaRoche. Finally, defendant stated, he "did not receive any compensation from Davisville, LaRoche, or Q.L.C.R.I. relative to [his] services as special agent in this transaction" and he was never indicted for his role in the transaction.

The trial justice reviewed these assertions and concluded that defendant had alleged sufficient facts to establish, for summary-judgment purposes, that defendant was an agent for LaRoche and Q.L.C.R.I. and that Davisville was aware of this agency relationship. The trial justice further determined, however, that "none of the facts presented by defendant, separately or cumulatively, is enough to put a subsequent holder of the note on notice of any agency relationship." In addition, she concluded that none of the documents in the loan file qualified as a written agreement within the meaning of

§ 42–116–23.[1]

In reaching these conclusions, the trial justice identified two types of claims or defenses that may be asserted against DEPCO when the claim stems from the litigant's relationship with a failed credit union. This Court recognized these two types of claims or defenses in *Rhode Island Depositors' Economic Protection Corp. v. NFD Co.*, 687 A.2d 452, 454 (R.I.1997). In that opinion, we stated:

"The federal courts have consistently held that the only claims and defenses that can be raised against the Federal Deposit Insurance Corporation (FDIC), the federal counterpart of DEPCO, are real defenses that make the underlying loan agreement void and not merely voidable, *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1346–47 (1st Cir.1992), and claims arising from agreements that are 'supported by some explicit writing in the bank's official records or by an express written agreement between the banking institution and the claimant,' *Paradis [v. Greater Providence Deposit Corp.*, 677 A.2d 1340, 1343 (R.I.1996) ] (citing numerous federal cases)." 687 A.2d at 454.

These two defenses are known as the federal holder-in-due-course doctrine and the *D'Oench, Duhme* doctrine, respectively. We shall address them separately.

### Federal Holder–in–Due–Course Doctrine

The holder-in-due-course doctrine is traditionally a state law concept. Under Rhode Island's enactment of the Uniform Commercial Code, codified as title 6A of the General Laws, a holder in due course is defined as a holder who takes a negotiable instrument[2] "(a) For value; and (b) In good faith; and (c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." Section 6A–

3–302. A holder of a negotiable instrument does not become a holder in due course "(a) By purchase of it at judicial sale or by taking it under legal process; or (b) By acquiring it in taking over an estate; or (c) By purchasing it as part of a bulk transaction not in regular course of business of the transferor." Section 6A–3–302(3). Normally, an entity such as the FDIC or DEPCO acquires a promissory note from a failed bank in a bulk transfer and not in the ordinary course of business of the transferor. The FDIC or DEPCO, therefore, would not normally qualify as a holder in due course under state law. In the case of the FDIC, however, the federal courts have devised a federal common-law doctrine that grants holder-in-due-course status when, as part of a purchase and assumption transaction, defined *post*, the FDIC acquires a note for value, in good faith, and without notice of personal defenses, whether or not the technical requirements of the state law holder-in-due-course doctrine have been satisfied. We shall now consider whether DEPCO should be entitled to similar protection.

The seminal case on the federal holder-in-due course doctrine is *Gunter v. Hutcheson*, 674 F.2d 862 (11th Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In that case, the FDIC arranged a purchase and assumption transaction in order to pay the depositors of a failed bank. In a purchase and assumption transaction, the receiver of the failed bank transfers the assets and liabilities of the failed bank to another, solvent bank. In order to shield the acquiring bank from loss that may result from the acquisition of high-risk assets such as defaulted loans, the acquiring bank is permitted to return assets that are not of the highest quality. The FDIC as corporate insurer[3] then purchases the returned assets

---

1. The trial justice actually cited G.L.1956 § 19–15–12, now codified as § 19–12–13, which applies to claims against the receiver of a failed financial institution or credit union. This erroneous citation is of no consequence because the requirements of § 19–12–13 are identical to those of G.L.1956 § 42–116–23.

2. Negotiable instruments are defined in G.L.1956 § 6A–3–104. The defendant has not argued on appeal that the promissory note was not negotia-

ble. *See Sunbelt Savings, FSB Dallas, Texas v. Montross*, 923 F.2d 353, 356–57 (5th Cir.) (federal holder-in-due-course protection does not extend to nonnegotiable instruments), *rehearing en banc granted*, 932 F.2d 363, *opinion reinstated in pertinent part*, 944 F.2d 227 (5th Cir.1991).

3. The FDIC normally acts as both receiver and corporate insurer when dealing with a failed bank. *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.), *cert denied*, 459 U.S. 826, 103 S.Ct.

from the receiver, who in turn forwards the money to the acquiring bank. In essence, the FDIC makes good on the risky assets of the failed bank, thus allowing the assets and money transferred to the acquiring bank to equal or exceed the assumed liabilities. The FDIC then attempts to collect on the assets returned by the acquiring bank in order to minimize loss to the insurance fund. A purchase and assumption transaction may be accomplished within a relatively short time frame and offers the advantage of minimal disruption of the banking system. Moreover, a purchase and assumption transaction permits the going-concern value of the failed bank to be preserved, an outcome not possible when a failed bank is liquidated, and it offers the acquiring bank an attractive method for expanding its customer base.

As a result of the purchase and assumption transaction arranged by the FDIC in *Gunter,* the FDIC in its corporate capacity acquired a promissory note payable to the failed bank. The makers of the note disputed liability on the basis of, among other things, fraudulent misrepresentation by the directors of the bank. The court considered the makers' claims and concluded that the policies behind the creation of the FDIC—namely, promoting the stability of and confidence in the nation's banking system—required that the FDIC's right to collect on assets returned in the context of a purchase and assumption transaction should not be subject to fraud claims of which the FDIC had no knowledge at the time of the transaction. *Gunter,* 674 F.2d at 870. The court reasoned that, if such claims could be asserted against the FDIC, then the FDIC would be unable to make an accurate assessment of its potential liability from a purchase and assumption transaction versus its potential liability from a liquidation, an assessment the FDIC is required to make by statute. *Id.* at 869–70. The court further observed that had the bank transferred the note to another institution in the ordinary course of business for value, in good faith, and without notice of the fraud claim, the transferee would have taken the

note as a holder in due course free from the fraud claim. *Id.* at 872. Given the possibility that a holder in due course under state law would not be subject to the plaintiffs' fraud claim, the court concluded that the plaintiffs were in no worse position under a federal rule protecting the FDIC. *Id.*

Relying on these considerations, the court held that "as a matter of federal common law, the FDIC has a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction, for value, in good faith, and without actual knowledge of the fraud at the time the FDIC entered into the purchase and assumption agreement." *Id.* at 873. This doctrine has come to be known as the federal holder-in-due-course doctrine. *See, e.g., In re 604 Columbus Avenue Realty Trust,* 968 F.2d 1332, 1350 (1st Cir.1992) (discussing doctrine). Its signal features are that it affords the FDIC the protections of the holder-in-due course doctrine of the Uniform Commercial Code, *see* G.L.1956 §§ 6A–3–302 to 6A–3–305 (setting forth qualifications and rights of holder in due course in Rhode Island), that is, immunity from personal defenses, while relieving the FDIC of the necessity of complying with all the "technical requirements" of state law. *Campbell Leasing, Inc. v. FDIC,* 901 F.2d 1244, 1249 (5th Cir.1990); *FDIC v. Wood,* 758 F.2d 156, 160 (6th Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985). Personal defenses, such as failure of consideration, nondelivery, and fraud in the inducement, are not truly defenses against the note but rather defenses or claims based on the underlying transaction. *Wood,* 758 F.2d at 160. *See* 11 Am.Jur.2d § 654 (discussing personal defenses). Real defenses, which may be asserted against a holder in due course, are defenses against the note and include infancy; incapacity, duress, or illegality of the transaction that renders the party's obligation a nullity; fraud in the factum; and discharge in bankruptcy. Section 6A–3–

60, 74 L.Ed.2d 63 (1982). DEPCO's role is analogous to the FDIC's corporate role but not its receivership role. As we stated in *Rhode Island Depositors Economic Protection Corp. v. Phillips,*

643 A.2d 215, 216 (R.I.1994), "DEPCO has a completely separate identity from that of the receiver."

305(2). The federal holder-in-due-course doctrine thus extends to the FDIC the protection from personal defenses normally enjoyed by holders in due course under state law but does not extend to the FDIC protection from real defenses. More specifically, "[t]he federal holder in due course doctrine bars the makers of promissory notes from asserting various 'personal' defenses against the FDIC in connection with purchase and assumption transactions involving insolvent banks." *Campbell Leasing, Inc.*, 901 F.2d at 1248.

In the instant case, the assets and liabilities of Davisville were transferred by the receiver to another bank pursuant to a purchase and assumption agreement. As part of this transaction, DEPCO agreed "to make certain investments in the [acquiring] Bank and to provide by means of an Exchange Agreement, to swap good loans which DEPCO has or may acquire for devalued loans of [Davisville] in order that assets being acquired by the Bank will equal or exceed the liabilities being assumed by it." Then DEPCO sought to collect on defendant's promissory note, which was one of the devalued assets not accepted by the acquiring bank. The defendant has sought to avoid liability on the note, which he admitted signing, on the basis of an unrecorded agency agreement.

■ We are of the opinion that the same concerns that prompted the federal courts to extend the holder-in-due-course doctrine to the FDIC apply with equal force to DEPCO, even though both the FDIC and DEPCO acquire the assets of failed institutions in bulk transfers and not in the ordinary course of business.[4] *See* § 6A-3-302(3)(c) (such a holder not normally a holder in due course). If makers are permitted to assert personal defenses of which DEPCO has no notice, actual or constructive, DEPCO would be unable to rely on the records of a failed credit union and, as a result, would be unable to assess accurately the assets and liabilities of the failed institution. Such uncertainty would add an element of risk to purchase and assumption agreements, resulting in the discouragement of such agreements and in the diminution of funds available to DEPCO. Such disruption of DEPCO in the fulfillment of its statutory mission would run counter to the purposes for which DEPCO was created. These purposes include "the prompt payment of the deposit liabilities of the financial institutions to each depositor to the extent and in the manner as [DEPCO] shall determine," in a manner that will "(i) Maximize the return from the sale or other disposition of the assets of [DEPCO]; (ii) Minimize the impact of such transactions on local real estate and financial markets; and (iii) Make efficient use of funds obtained from the proceeds of the assets or from the state." G.L.1956 § 42-116-2(e). We are of the opinion that the same circumstances under which a maker of a note would be liable to a regular holder in due course under § 6A-3-305 should apply to DEPCO. That is to say, the public policy

4. The creation of federal common law in the FDIC context has been called into doubt. *See New Bedford Institution for Savings v. Calcagni*, 676 A.2d 318, 320 n. 2 (R.I.1996) (discussing effect of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) on federal common law in the FDIC arena). This issue was addressed in a United States Supreme Court opinion, *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). In that case, the FDIC, as receiver of a failed savings and loan, filed a lawsuit against the attorneys of the savings and loan, alleging professional negligence and breach of fiduciary duty. The Supreme Court declined to adopt a federal rule of decision to determine whether the attorneys could be held liable in tort or whether the knowledge of the bank's officials could be imputed to the FDIC as receiver. The Court concluded that it would not "adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law." *Id.* at 85, 114 S.Ct. at 2054, 129 L.Ed.2d at 74. At least one federal district court has interpreted *O'Melveny* as requiring that state law be applied to determine whether the Resolution Trust Corporation in its receivership capacity is a holder in due course. *Resolution Trust Corp. v. A.W. Associates, Inc.*, 869 F.Supp. 1503, 1510 (D.Kan.1994). Regardless of the effect of *Erie* and *O'Melveny* on the federal holder-in-due-course doctrine, we are of the opinion that such a doctrine is properly applied to DEPCO under Rhode Island law. We note that four justices of the United States Supreme Court signed a concurring opinion in *O'Melveny*, emphasizing the propriety of state courts' fashioning a special rule to protect the interests of creditors and taxpayers when a corporation has become insolvent.

underlying the creation of DEPCO is better served by extending to DEPCO holder-in-due-course status when it takes a negotiable instrument as part of a purchase and assumption transaction for value, in good faith, and without knowledge of any personal defenses.

The protection enjoyed by a holder in due course, however, is not absolute. We agree with the trial justice that "[t]he primary and most effective way for a defendant to pierce the protections afforded by the federal holder in due course doctrine is for the party asserting the defense to establish that the FDIC possessed actual knowledge of the defense before taking the note." *See Wood,* 758 F.2d at 162 (actual knowledge must be shown as of date FDIC entered into agreement). Although defendant has argued that DEPCO in fact knew or should have known of his agency relationship with La-Roche because of information in the loan file, we concur with the trial justice that the documents referred to by defendant are by themselves insufficient to create a factual question as to whether DEPCO was aware of the agency relationship at the time it acquired the note. *Cf. id.* (FDIC cannot be charged with knowledge of a defense "merely because that information could be found in the bank's files"). There was no agreement or document in the loan file absolving defendant from liability on the note. The defendant's position was essentially that because his straw-man status in relation to LaRoche was arguably discernible on close inspection of the bank records, a factual question was created concerning whether DEPCO had notice of the alleged agency. It is our conclusion that DEPCO was entitled to rely on the documents in the loan file as meaning what they said, namely, that defendant was obligated to pay the note in his individual capacity. In the absence of any other evidence allegedly supporting an inference that DEPCO had knowledge of defendant's claim at the time it acquired the note, the trial justice correctly treated DEPCO as a holder in due course.

## D'Oench, Duhme Doctrine

The determination that DEPCO held the note as a holder in due course does not end our analysis. The defendant has also argued that his agency relationship with LaRoche was memorialized in writing within the meaning of § 42–116–23. This section provides:

> "Certain agreements.—No agreement which tends to diminish or defeat the interest of the corporation in any asset acquired by it under this chapter shall be valid against the corporation unless such agreement:
>
> (a) Is in writing;
>
> (b) Was executed by the eligible institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the eligible institution;
>
> (c) Was approved by the board of directors of the eligible institution or its loan committee; which approval shall be reflected in the minutes of the board or committee; and
>
> (d) Has been, continuously, from the time of its execution, an official record of the eligible institution."

This statute, as we observed in *NFD Co.,* 687 A.2d at 453, contains substantially the same language as that found in § 19–12–13 (formerly codified as § 19–15–12) of Rhode Island's receivership statute. Both of these statutes essentially replicate 12 U.S.C. § 1823(e) of the Federal Deposit Insurance Corporation Act, which codifies the federal common-law doctrine that originated in the United States Supreme Court's opinion in *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942).

In *D'Oench, Duhme,* the Supreme Court concluded that federal policy required protecting the FDIC from secret agreements not contained in a bank's official records. *Id.* at 461–62, 62 S.Ct. at 681, 86 L.Ed. at 964. The practical application of the *D'Oench, Duhme* doctrine is similar to that of the federal holder-in-due-course doctrine discussed *ante,* insofar as the FDIC is presumably on notice of written agreements contained in the official records of a failed bank. There are situations, however, in which the

two doctrines diverge and are treated separately. *See, e.g., 604 Columbus Avenue Realty Trust,* 968 F.2d at 1344–50; *Campbell Leasing, Inc.,* 901 F.2d at 1247–49; *Gunter,* 674 F.2d at 866–68. In the instant case, the important difference is that the *D'Oench, Duhme* doctrine, as codified in § 42–116–23, does not require actual notice on the part of DEPCO. If the agreement sought to be enforced meets the statute's four requirements, DEPCO's lack of knowledge of the agreement will not defeat a claim based on the agreement.

■■■■ The defendant has argued that his agency relationship was reflected in various documents executed at the closing and that these documents, taken together, constituted a written agreement within the meaning of § 42–116–23. The defendant contended that the trial justice erred in requiring a "specific written document evidencing the agreement" because the statute does not require a specific written document. This Court squarely addressed this issue in *Paradis v. Greater Providence Deposit Corp.,* 677 A.2d 1340 (R.I.1996), in which we stated that the United States Supreme Court, in *Langley v. Federal Deposit Insurance Corp.,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), had "laid to rest any attempt to avoid the specific in-writing requirement in 12 U.S.C. § 1823(e)." *Paradis,* 677 A.2d at 1343. We observed that, in the wake of *Langley,*

> "both federal and state court holdings have unanimously and strictly followed the *Langley* ruling in requiring that any alleged agreement, including alleged implied agreements sought to be enforced against a banking institution receiver, be supported by some explicit writing in the bank's official records or by an express written agreement between the banking institution and the claimant." *Id.*

We adopted the views of these federal and state courts with regard to § 19–12–13 of the receivership statute, *id.,* and we now reach the conclusion that § 42–116–23 of the DEPCO statute, which for all practical purposes is a carbon copy of § 19–12–13, compels the same result. The defendant therefore must identify an explicit written agreement in the bank's records in order to absolve himself of liability on the note. This, defendant has been unable to do and, indeed, defendant candidly admitted before the trial justice that placing an agency form in the loan file would have frustrated the purpose of the transaction, which was to "pull the wool over everyone's eyes." This absence of a written agreement expressing defendant's agency relationship with LaRoche and the putative intent of the parties that defendant not be held liable on the note presents an insurmountable hurdle to defendant's defense, and consequently, we conclude that the trial justice did not err in granting DEPCO's motion for summary judgment.

■■■■ We note that the defendant's claim that he was innocent of conscious wrongdoing does not preclude application of the *D'Oench, Duhme* doctrine. Innocent intent provides no exception "because lack of bad faith, recklessness, or even negligence is not a defense in *D'Oench* cases." *Baumann v. Savers Federal Savings & Loan Assoc.,* 934 F.2d 1506, 1516 (11th Cir.1991), *cert. denied,* 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). Such an exception is not provided for in § 42–116–23 and in any case would run counter to *D'Oench, Duhme'*s purpose of preventing enforcement of "any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records." *Baumann,* 934 F.2d at 1515.

For these reasons, we deny and dismiss the defendant's appeal and affirm the judgment of the Superior Court, to which we return the papers in this case.

GOLDBERG, J., did not participate.